Tomasina McCLAIN o/b/o Jeffrey McClain, a minor, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. 02 CIV. 2842.

United States District Court, S.D. New York.

Jan. 28, 2004.

310

James M. Baker, Esq., Center for Disability Advocacy Rights, Inc., New York, NY, for plaintiff.

Lorraine S. Novinski, Esq., Assistant United States Attorney, New York, NY, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

### I. BACKGROUND AND PRIOR PROCEEDINGS

Plaintiff Tomasina McClain ("McClain") commenced this action on behalf of her son, Jeffrey McClain ("Jeffrey"), pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). She seeks review of the determination by the United States Commissioner of Social Security (the "Commissioner") finding that Jeffrey is not disabled and denying his application, initially filed over nine years ago, for children's Supplemental Security Income ("SSI") benefits. McClain's petition asks the Court to reverse the Commissioner's ruling and award benefits, based on overwhelming evidence she asserts is now on the record documenting Jeffrey's disability and on the significant adjudicatory delays in resolving his SSI claim.

In an earlier round of litigation of McClain's action, this Court reversed and remanded the Commissioner's decision of February 1, 1999 denying Jeffrey's application. *See McClain v. Halter*, No. 99 Civ. 3236VMJCF, 2001 WL 619177 (S.D.N.Y. June 5, 2001). In that case, the Commissioner had adopted the findings of the Administrative Law Judge ("ALJ") that Jeffrey was not disabled, concluding that Jeffrey did not suffer from any medically determinable physical or mental impairment as defined under the Social Security Administration's ("SSA") regulations.

In overturning the Commissioner's 1999 decision, this Court adopted the Report and Recommendation of Magistrate Judge James Francis IV, dated January 26, 2001, which found that the ALJ had: (1) not adequately developed the record in that he had conducted perfunctory hearings and failed to obtain relevant school and medical records; (2) overlooked evidence in the record favoring Jeffrey's disability claim; (3) made findings that Jeffrey lacked marked limitations in the areas of concentration, persistence and pace, social functioning, cognition and communication that were not supported by substantial evidence in the record; and (4) failed to consider whether Jeffrey might still suffer from marked functional limitations despite some improvement in these areas. The Court concluded that the ALJ's findings were not supported by substantial evidence and, declining to order interim benefits, imposed instead a 90–day limit for completion of any further administrative proceedings and final determinations of SSI eligibility. *See id.* at *1.

On remand, after considering McClain's submission of additional evidence and conducting a hearing held on August 8, 2001, the ALJ again found Jeffrey not disabled. This ruling, issued on January 25, 2002 and later adopted by the Commissioner, was rendered 224 days after this Court's initial Order directing a 90–day time limit on the remand proceedings. In the instant action, McClain seeks review of the Commissioner's second ruling on Jeffrey's claim. The Government, acknowledging that the ALJ had failed to provide a sufficient explanation of his reasoning for denying the application, requested that the Commissioner's decision be reversed and remanded for further administrative proceedings in order to correct this error. McClain responded with a cross-motion seeking reversal of the Commissioner's 2002 determination and an immediate award of benefits, or in the alternative, reversal and remand for a new hearing and decision.

The Court referred the case to Magistrate Judge Michael H. Dolinger, the designated Magistrate Judge for this action, for review of the parties' respective mo-

tions. In a Report and Recommendation (the "Report") dated January 7, 2004, Magistrate Judge Dolinger recommended that the Commissioner's decision be reversed and that the case be remanded solely for the purpose of calculating and awarding the SSI benefits due to Jeffrey. A copy of the Report is attached hereto and incorporated as part of this Decision and Order. In accordance with Federal Rule of Civil Procedure 72, Magistrate Judge Dolinger set January 17, 2004 as the date by which any written objections to the Report were to be filed. Neither party has interposed objections.

Accordingly, having considered the materials on the record in support of and opposition to Jeffrey's claim as asserted by McClain in this action, the Commissioner's decision affirming the ALJ's January 25, 2002 determination denying that claim, the submissions and arguments of the parties in connection with the instant motions, and Magistrate Judge Dolinger's thorough and careful Report addressing the issues raised by this controversy, the Court adopts the Report in its entirety. The Court finds that there is sufficient basis on the record of the administrative proceedings on remand, as well as in the principles, authorities and analysis relied upon and cited in the Report, to support a reversal of the Commissioner's 2002 decision, and for the Court to order a remand of this case to the Commissioner for the sole purpose of calculating and awarding SSI benefits to Jeffrey. *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir.2000); *Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir.1983); *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980); *accord Allen v. Bowen*, 881 F.2d 37, 44 (3d Cir.1989).

## II. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation dated January 7, 2004 submitted to this Court by Magistrate Judge Michael H. Dolinger is incorporated into the Court's Decision and Order herein and the Report's findings, reasoning and conclusions are adopted in their entirety; and it is further

**ORDERED** that the decision of defendant Jo Anne B. Barnhart, as United States Commissioner of Social Security (the "Commissioner") affirming the determination of the Administrative Law Judge dated January 25, 2002 denying the application for Supplemental Security Income ("SSI") filed by plaintiff Tomasina McClain ("McClain") on behalf of Jeffrey McClain ("Jeffrey"), is reversed and remanded to the Commissioner; and it is finally

**ORDERED** that the Commissioner is directed to calculate and award to Jeffrey forthwith the SSI benefits to which he is entitled pursuant to this Order.

The Clerk of Court is directed to enter judgment for McClain consistent with this Order and to close this case.

**SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DOLINGER, United States Magistrate Judge.

Tomasina McClain brings this action on behalf of her son, Jeffery McClain, pursuant to the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). She seeks review of the determination by the Social Security Administration Commissioner ("the Commissioner") finding her son not disabled and denying his application for children's Supplemental Security Income ("SSI") benefits. Plaintiff requests that this court reverse the Commissioner's determination and award benefits, based on

plaintiff's overwhelming evidence of her son's disability and the significant adjudicatory delays in resolving plaintiff's SSI claim, which was initially filed over nine years ago. Alternatively, plaintiff seeks reversal and remand for a new hearing and decision. The Government requests that this court reverse the Commissioner's determination and remand the case for further proceedings.

For the reasons that follow, we recommend that the Commissioner's determination be reversed and the case be remanded solely for the calculation of benefits.

### PROCEDURAL HISTORY

On May 19, 1994, plaintiff filed an application for SSI benefits on behalf of her son, Jeffrey McClain, then age four (now age fourteen), reporting that he was speech-impaired and exhibited hyperactive and aggressive behavior. (Administrative Record Transcript ("Tr.") 10, 62). The Commission denied this application both initially and on reconsideration. (Tr. 10). Thereafter, on February 21, 1996 and July 2, 1997, Administrative Law Judge ("ALJ") Louis Zamora presided over hearings on Jeffrey's claim. (Complaint ("Compl.") at ¶ 4). On April 22, 1998, the ALJ issued his decision, finding Jeffrey not disabled on the ground that he did not suffer from any medically determinable physical or mental impairment as defined under the Social Security Administration's

("SSA") regulations. (Tr. 21–22). The ALJ's decision became final on February 1, 1999 when the Social Security Appeals Council denied plaintiff's request for review. (Compl. at ¶ 4, Tr. 4–6).

Plaintiff subsequently filed an action in the Southern District of New York on February 25, 1999, seeking review of the 1998 decision. (Tr. 360). On June 5, 2001, the Honorable Victor Marrero reversed and remanded the case on the ground that the ALJ's findings were not supported by substantial evidence.[1] He also imposed a ninety-day time limit on further administrative proceedings and a final determination of SSI eligibility.[2] (Tr. 401–05).

After plaintiff's submission of additional evidence and a hearing held on August 8, 2001, ALJ Zamora issued a second decision on January 25, 2002, finding Jeffrey not disabled. (Tr. 311–20). This occurred 224 days after the issuance of the district court order, post-dating the ninety-day time limit by over four months.

On April 12, 2002, plaintiff filed this action seeking review of the Commissioner's second determination of non-disability. (Compl. at first page). The Government subsequently filed a motion, acknowledging that the ALJ had failed to provide a sufficient explanation of his reasoning for denying Jeffrey's claim and requesting that the 2002 decision be reversed and remanded for further administrative pro-

---

1. With respect to the decision to reverse and remand, Judge Marrero adopted United States Magistrate Judge James Francis IV's January 26, 2001 Report and Recommendation ("R & R") which found, *inter alia,* that: (1) the ALJ had failed to adequately develop the record in that he had conducted perfunctory hearings and failed to obtain relevant school and medical records, (2) the ALJ had overlooked evidence in the record favoring Jeffrey's disability claim, (3) the ALJ's findings that Jeffrey lacked marked limitations in the areas of concentration, persistence and

pace, social functioning, cognition and communication were not supported by substantial evidence in the record and (4) the ALJ had failed to consider whether Jeffrey might still suffer from marked functional limitations despite some improvement in these areas. (Tr. 380–95).

2. This time limit was imposed as an alternative to Judge Francis' recommendation that interim benefits be awarded pending the final determination of SSI eligibility. (Tr. 402–03).

ceedings in order to correct this error. (Memorandum of Law in Support of Defendant's Motion for Remand ("Remand Memo") at p. 6). Plaintiff then filed a cross-motion seeking reversal of the 2002 decision and an immediate award of benefits, or in the alternative, reversal and remand for a new hearing and decision. (Notice of Motion dated Feb. 20, 2003).

### THE COMMISSIONER'S STANDARD FOR SSI BENEFITS BASED ON CHILDHOOD DISABILITY

Since 1974, disabled children under the age of eighteen from low-income families have been entitled to receive cash benefits known as SSI under Title XVI of the Social Security Act ("the Act"). In order to qualify for SSI: (1) the child's income and assets (including those imputed from the child's parents) must fall below a specified amount and (2) the child must be "disabled"—i.e., must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(a)(3)(c)(i).

The SSA regulations set forth a three-step "sequential evaluation process" for determining whether a child is disabled. 20 C.F.R. § 416.924. The first step inquires whether the child is working at the "substantial gainful activity" level. If yes, the child is not disabled. 20 C.F.R. § 416.924(a). If no, the evaluation continues to the second step which inquires whether the child has any "severe" impairment, defined as more than a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). If the child does not have a severe impairment, he is not disabled. If

the child does have a severe impairment, the third step in the sequential analysis requires a determination of whether the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal" the listed impairments located in Appendix 1 to Part 404, Subpart P of 20 C.F.R. 20 C.F.R. § 416.924(d). If yes, the child is disabled; if no, the child is ineligible for SSI benefits. Id.

At issue in this case are limitations that are alleged to be "functionally equal" to a listed impairment. Functional equivalence is determined by evaluating how the child's limitations affect six "broad areas of functioning" known as "domains." 20 C.F.R. § 416.926a(b)(1). These domains include: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself and (6) health and physical well-being.

For each domain, the Commissioner rates the degree of limitation, if any, as "less than marked," "marked," or "extreme." 20 C.F.R. §§ 416.926a(d) & (e). A child is deemed to be disabled if he has an "extreme" limitation in one domain, or "marked" limitations in two or more domains. 20 C.F.R. §§ 416.926a(d).

A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the same ability. 20 C.F.R. § 416.926a(e)(3)(i). In areas of functioning that can be measured by a standardized test, a test score two or more standard deviations ("SDs") below the norm for that test constitutes a marked limitation, while a test score three or more SDs below the norm constitutes

an extreme limitation. 20 C.F.R. § 416.926(e)(2)(i).

For a child to have a marked or extreme limitation in a particular domain, not all activities or functions encompassed by the domain need be impaired. For instance, a twelve-year old child could have a marked or extreme limitation in the domain of acquiring and using information if he had a serious learning disability which had prevented him from learning to read and write even though he was of normal intelligence and had good verbal communication skills. *See, e.g., Quinones v. Chater,* 117 F.3d 29, 31–32, 36 (2d Cir.1997).

 Alternatively, when a child suffers from multiple impairments within a single domain, each of which, when considered separately, imposes a less-than-marked limitation, the combined result nonetheless may be marked or extreme. *See, e.g., Encarnacion v. Barnhart,* 191 F.Supp.2d 463, 474 (S.D.N.Y.2002) (two less-than-marked limitations in the area of social functioning may cumulatively contribute to the finding of a marked or extreme limitation in the area of social functioning).

## REVIEW OF THE ADMINISTRATIVE RECORD

Unlike the record from the 1998 adjudication of Jeffrey's claim, the administrative transcript from the 2002 decision includes all records from the previous hearings as well as all manner of school records, doctors' reports and psychological reports. Although, as the ALJ noted, this record contains "a lot of inconsistencies" (Tr. 355), adequate evidence exists to support plaintiff's claimed history of disability.

### I. *Family History*

Jeffrey McClain ("claimant") was born on July 31, 1989, to Tomasina McClain, a native of the Dominican Republic, with whom he currently lives. (Tr. 90, 326).

Mrs. McClain's primary language is Spanish, which is spoken at home. Jeffrey's dominant language is English, although he has shown some ability in both languages. (Tr. 162, 466).

Jeffrey has never had any contact with his biological father, Otis McClain. Until June 1995, he lived with his mother, his paternal uncle and stepfather, Jerry McClain—whom he referred to as "Daddy"—his two older siblings, Jerry Jr. and Jennifer, and his maternal uncle, Constansio Acevedo. (Tr. 90, 91). The family was supported on public assistance. (Tr. 90).

In June of 1995, Jerry McClain left the household after a fight with Jeffrey's mother, taking Jeffrey's two siblings with him. (Tr. 296). Since that time, Jeffrey and his mother have not seen the three other family members, resulting in great emotional turmoil for both of them. (Tr. 233, 238, 255, 296).

### II. *Scholastic Record and Special Education Services*

In 1993, at age three, Jeffrey was referred to the Highbridge Advisory Council Child Care Center ("Highbridge") because of negative behavior—including aggression, tantrums and destruction of property—as well as speech and language delays. (Tr. 361). Highbridge provided him speech and language therapy and counseling until he aged out of the program in 1994. (Tr. 361).

In the fall of 1994, Jeffrey was evaluated by the Committee on Special Education and placed in a Modified Instruction Services IV ("MIS IV") class in the public school system for twenty-five hours a week. (Tr. 69, 73, 361). There he received occupational and speech and language therapy until he aged out of the program in 1997. (Tr. 362). Before leaving MIS IV, Jeffrey's verbal IQ was

described in 1997 as low-average, but both his performance and full-scale IQs were described as borderline between low-average intellectual functioning and mild mental retardation. (Tr. 1038). *See* Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV") at 45 (IQ range from seventy-one to eighty-four considered borderline).

Upon leaving the MIS IV program in 1997, Jeffrey was enrolled in another special education program at a different school, where he continued to receive speech therapy. (Tr. 362, 448–49). In a 1997 Individual Education Plan ("IEP") evaluation, his expressive and receptive language skills were both described as "delayed," while his math and reading skills were noted as "extremely delayed." (Tr. 1048–49).

Jeffrey's 2000 IEP classified him as speech-impaired. It indicated that at age eleven he knew the alphabet and could "sometimes make sounds independently," but that his short-term goals included learning the sounds made by different combinations of letters. (Tr. 420, 422). Moreover, in order for Jeffrey to take tests, the questions had to be read aloud to him and the time limits waived. (Tr. 427).

At the time of the ALJ's 2002 decision, Jeffrey was attending the sixth grade, where he was performing weakly in reading and math but had improved his speech delays. (Tr. 317).

### III. *Mental Health Diagnoses and Treatment*

In August 1995, Jeffrey was diagnosed with Attention Deficit and Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD") at the Bronx Center for Community Services, a clinic which is affiliated with the Psychiatric Department of the Bronx Lebanon Hospital. (Tr. 292,

362, 958). He began receiving on-going weekly therapy, which continued at least through April 2001 (Tr. 778–970), although the record shows a history of missed sessions. (*see, e.g.,* Tr. 789–90, 793, 795–98, 959–60).

Since 1995, Jeffrey at various times has been prescribed Ritalin, Tenex and Adderall to calm his behavior. (Tr. 180, 343, 362, 953). The record indicates that plaintiff has not always been consistent in administering Jeffrey's medicine. (Tr. 285, 824, 840, 842, 885). However, in 1997, claimant's psychiatric social worker noted a positive response to Ritalin. (Tr. 285). Plaintiff also testified in 2001 that medication helped to keep Jeffrey from fighting at home and at school but that it upset his stomach. (Tr. 342).

Socially, Jeffrey's 1997 IEP evaluation describes him as compromised in his interactions with others because of his low tolerance for frustration, his difficulty delaying gratification, his short attention span and his high activity level. (Tr. 1043–33). In 2000, his teacher described him as having difficulty interacting with peers but "well behave[d] when alone." (Tr. 459). He was also suspended on various occasions between 1997 and 2001 for using force against others, fighting and bringing weapons to school. (Tr. 517–22, 751–52, 757).

### IV. *Domain–Specific Record Evidence*

The record contains evidence that is specific to the broad functional areas called "domains," which the SSA evaluates when determining SSI eligibility. The three domains relevant to Jeffrey's claim, along with record evidence pertinent to each one, are described below.

### A. Acquiring and Using Information

The domain of "acquiring and using information" for six-to twelve-year-old chil-

dren—Jeffrey's age-group during the majority of the time that his claim has been pending—is described in the SSA regulations as follows:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; *e.g.*, by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (*e.g.*, reading street signs, telling time and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

As to be expected in a record this voluminous, there are numerous references to both Jeffrey's limitations and his strengths in this domain. For instance, multiple entries describe his trouble understanding and following directions.[3] Partly contradicting this evidence are references to claimant's willingness to follow at least simple directions.[4] On balance, however, these entries indicate that Jeffrey has trouble acquiring and using information is a school setting. We infer from this evidence that he also likely has difficulty "understanding and responding to the opinions of others," which is another component of the "acquiring and using information" domain. *Id.*

The record also evidences a language delay,[5] resulting in both oral language

---

3. *See, e.g.*, Tr. 95 (1993 psychological report states, "he experienced significant difficulty in comprehending test instructions"), Tr. 675 (1994 IEP report notes that Jeffrey "doesn't follow directions"), Tr. 593 (1994 IEP report notes, "Jeffery has difficulty following oral directions"), Tr. 185 (1995 medical report states, "Pt. has difficulty following instructions"), Tr. 605 (1996 speech/language evaluation notes, "He has difficulty following directions"), Tr. 564 (1996 IEP report notes Jeffrey "has trouble following directions"), Tr. 586 (1997 teacher's report states, "He has difficulty listening + following directions"), Tr. 429 (1997 psychological examination notes, "he does not listen or follow directions"), Tr. 420 (2000 school report notes, "He is experiencing difficulty in comprehending instructions, and a(sic) times have to be repeated 3/4 times."), Tr. 427 (2000 school report indicates that state-wide learning assessments modified to allow for directions to be "read and reread aloud"), Tr. 445 (2000 speech/language progress report notes that Jeffrey "has difficulty listening + following directions"), Tr. 458 (2000 teacher's report states, "directions have to be repeated 3 or 4 times before he gets what he needs to do").

4. *See, e.g.*, Tr. 101 (1993 teacher's report notes child follows directions, appears to understand what is said to him), Tr. 527 (1994 IEP report notes, "Jeffrey is able to follow simple oral directions"), Tr. 661 (1994 occupational therapy assessment states, "Jeffrey is a cooperative little boy ... He followed simple one step commands ... Jeffrey had difficulty completing those activities that required more than two steps to complete, requiring step by step cues"), Tr. 448 (2000 student progress report states, "He is able to answer questions appropriately and follow directions").

5. *See, e.g.*, Tr. 87 (1993 pre-school evaluation summary states "Jeffrey's [sic] according to the evaluation presents deficits in the receptive language component with a severe level below age level expectancy"), Tr. 740 (1993 speech and language evaluation notes that "various age level grammatical and syntactical constructions and forms appeared non existent (sic) and/or delayed"), Tr. 95 (1993 psychological report notes, "Jeffrey appears to be weakest in the areas of early language development and verbal expression"), Tr. 103 (1993 teacher's report stating, "Jeffrey has a

problems [6] and written language difficulties.[7] Despite this, Jeffrey has shown signs of improvement and instances of strength in the general language area.[8]

## B. Interacting and Relating with Others

In the domain of "interacting and relating with others," the SSA considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The characteristics of this domain for normal, school-age children are described as follows:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You

Speech and Language impairment"), Tr. 109–10 (1994 speech and language report notes "his speech and language development continue to be at a severe level below age level expectancy"), Tr. 528 (1994 IEP report says "Jeffrey McClain continues to demonstrate severe delays in receptive and expressive language components"), Tr. 434 (1997 psychological report states that claimant has below-average verbal skills), Tr. 439 (1997 bilingual educational evaluation notes that "Jeffrey's expressive language skills were delayed. Receptive language appeared to be delayed as well."), Tr. 466 (1997 IEP report notes "He exhibited delays in oral language skills in both [English and Spanish]"), Tr. 424–25 (2000 school report indicates "general education does not have adequate support needed to address Jeffery's (sic) language delays" and delays require a special education setting), Tr. 448 (2000 student progress report states that "formal/informal tests indicate continued delays in language").

6. See, e.g., Tr. 95, 101 (1993 psychological report indicates weakness in verbal concept formation and that child's speech characterized by some articulation errors, but not difficult to understand), Tr. 740 (1993 speech and language evaluation says "Jeffrey demonstrated little or no ability to engage in short dialogues of more that (sic) a few turns on a given topic"), Tr. 454 (1995–96 school report card shows "needs improvement" in oral language for three of four periods), Tr. 602 (1996 school report notes that claimant cannot associate sounds with letters), Tr. 442 (1997 speech/language evaluation states that claimant displays minor problems in sentence formulation and description), Tr. 458 (2000 teacher's report notes problems with oral expression, but notes that claimant can "most of the time make the correct sound individually").

7. See, e.g., Tr. 134 (1994 IEP report shows age at 4.7 years and writing level at 2 years), Tr. 612 (1996 teacher's report notes that at age six years and eight months, "Jeffrey knows 80% of letters"), Tr. 429 (1997 psychological examination states, "Jeffrey continues to show marked delays in Reading"), Tr. 464 (1997 IEP report states, "Jeffrey['s] reading skills were extremely below grade level"), Tr. 586 (1997 IEP report notes, "Jeffrey is extremely behind in Math and Reading"), Tr. 420 (2000 school report shows 2nd grade reading level while attending 5th grade).

8. See, e.g., Tr. 109 (1994 speech and language report indicates that Jeffrey showed gains in all areas of linguistic development), Tr. 593 (1994 IEP report notes, "he engages in conversation with peers and adults"), Tr. 454 (1995–96 report card shows "satisfactory" grade in reading), Tr. 604 (1996 speech and language evaluation stating that "Jeffrey's receptive vocabulary has increased approximately 3 years since he was tested in November 1993."), Tr. 293 (1997 psychiatric report notes that communication skills are age-appropriate), Tr. 442 (1997 speech and language evaluation says, "Jeffrey is progressing in speech"), Tr. 586 (1997 teacher's report states that claimant "can read about 10 sight words"), Tr. 448 (2000 student progress report indicates that claimant "expresses himself in simple, compound and complex sentences. He is able to answer questions appropriately and follow directions. Jeffrey can recall unrelated numbers and can discriminate syllables and consonants in words."), Tr. 420 (2000 school report notes that, at age eleven, Jeffrey knows alphabet and can make sounds independently).

should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand. 20 C.F.R. § 416.926a(i)(2)(iv).

The record contains a wealth of evidence regarding Jeffrey's problematic conduct in this domain, particularly with respect to his behavior at school. The record contains multiple references to specific incidents [9] as well as general statements about his poor social interactions,[10] and one report evidences concern about Jeffrey's social skills in unstructured settings.[11] Yet, in contrast, the record also contains reports praising his social skills and interactions.[12]

As for the oral language component of "interacting and relating with others"— *i.e.*, the ability to "talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand"— the record evidences both Jeffrey's shortcomings and achievements in this area. *See* ftns 6 and 8, *supra*.

## C. Attending and Completing Tasks

The domain of "attending and completing tasks" involves "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease

9. *See., e.g.,* Tr. 174 (teacher's note from 1995 stating that Jeffrey kicks and pushes other children), Tr. 757 (in 1997 "Jeffrey hit and kicked 3 students"), Tr. 271 (in 1997 Jeffrey suspended for bringing knife to school), Tr. 751 (Jeffrey suspended in 1998 for "using extreme force against or inflicting or attempting to inflict serious injury upon students or others."), Tr. 353–4 (Jeffrey has used weapons at home and at school, including cutting a twelve-year old girl with a knife in 2000), Tr. 949, 965 (2000 social worker's note states that Jeffrey "often laughed as he spoke of beating kids up" and describes him as "proud" that he had hit a female classmate).

10. *See., e.g.,* Tr. 586 (1994 IEP report stating that claimant can be a behavior problem, he has trouble getting along with his peers), Tr. 675 (1994 IEP report stating that claimant behaves poorly in groups), Tr. 581 (counselor observed in 1996 that "Jeffrey has difficulty interacting appropriately in group counseling. He has difficulty accepting limits on his behavior. His social skills and cooperative play need to be worked on this year."), Tr. 612 (1996 IEP report stating that claimant likes to touch and hit the other children), Tr. 430 (in March 1997 counselor states that "Jeffrey still needs to improve in areas of social skills, impulse control, and appropriate expression of feelings.").

11. *See., e.g.,* Tr. 429 (1997 psychologist report indicates concern about adjustment once removed from special education), Tr. 434 (same report states, "it appears that Jeffrey is in need of a small, structured setting that can offer the individual attention and support he needs to maintain behaviors conducive to learning").

12. *See., e.g.,* Tr. 160 (1993–94 school performance report states "Jeffrey gets along well with his peers"), Tr. 130 (1994 IEP report states that claimant "has not exhibited [] behavioral problems in the learning counseling environment"; "he has related amiably with his peers"; "he is making progress on...improving social interactions"), Tr. 212 (1996 behavior evaluation states that claimant is accepted by peer group, seen as a leader), Tr. 282 (1997 medical report states that Jeffrey has shown significant progress in behavior at school), Tr. 295 (1997 psychiatric report states that Jeffrey's aggressive behavior has declined due to medication and psychotherapy), Tr. 433 (1997 psychological report states, "Jeffrey shows adequate relatedness and capacity to relate in meaningful ways."), Tr. 466 (1997 IEP report notes, "Jeffrey demonstrated interpersonal skills in both English and Spanish."), Tr. 420 (2000 school evaluation notes "overall behavior is adequate").

with which you change them." 20 C.F.R. § 416.926a(h).

As noted, Jeffrey has been diagnosed with ADHD (Tr. 184, 209), a disorder characterized by a short attention span and difficulty concentrating on any one idea or task for an extended period of time. Consequently, many reports document Jeffrey's inability to focus on his assignments.[13] But again, the record also contains some evidence of Jeffrey's improved ability to concentrate.[14]

## V. The ALJ's 1998 Determination of Non–Disability

Engaging in the "sequential evaluation process" required by the SSA regulations, the ALJ in 1998 first found that Jeffrey was not engaged in substantial gainful activity. (Tr. 16). He next found that Jeffrey had a medically determinable combi-nation of impairments that was severe, including ADHD, conduct disorder and mild receptive and expressive language delay. (Id.). He then determined that Jeffrey's impairments were not functionally equivalent to any of those listed in the SSA regulations and thus concluded that Jeffrey was not disabled. (Tr. 22).

In determining that Jeffrey's impairments were not functionally equivalent to a listed impairment, the ALJ evaluated Jeffrey's performance in five areas of functioning: (1) cognitive and communicative, (2) motor skills, (3) social, (4) personal and (5) concentration, persistence or pace.[15] (Tr. 17).

The ALJ found less-than-marked limitations in cognitive and communicative functioning. (Tr. 18). The ALJ's cognition analysis was based upon a July 5, 1997

13. *See, e.g.,* Tr. 97 (1993 psychological report notes, "[Jeffrey] also exhibits difficulty in sustaining attention to task, growing increasingly restless and fidgety in the one-to-one learning setting."), Tr. 99 (1993 teacher's report notes that claimant "has difficulty remain (sic) seated for long periods of time compared with other children of his age."), Tr. 661 (1994 occupational therapy assessment states that claimant had difficulty completing tasks that required more than two steps to complete), Tr. 675 (1994 IEP report noted claimant is susceptible to distraction), Tr. 613 (1995 teacher's report states, "Jeffrey sometimes has trouble focusing (sic) in and staying on task"), Tr. 212 (1996 counseling evaluation describes claimant as distractible or inattentive, restless, and excitable), Tr. 564 (1996 IEP report notes, "[Jeffrey] has a short attention span, is distractive"), Tr. 295 (1997 psychiatric reports states claimant shows poor impulse control), Tr. 429 (1997 psychological examination report states that Jeffrey "has difficulty staying still and focusing on tasks"), Tr. 433 (same report notes, "A short attention span and high activity levels also effect (sic) his adjustment in school, and he needs frequent refocusing and supervision."), Tr. 586 (1997 school report states, "Jeffrey needs help w/ his work habits. He needs to focus in and keep still in order to stay on track.").

14. *See, e.g.,* Tr. 285 (1997 medical report notes that Jeffrey has shown improvements in ability to focus due to Ritalin), Tr. 433 (1997 psychological examination notes improvement in concentration and impulse control possible with continued guidance and support), Tr. 536 (during thirty-minute classroom observation in 1997, Jeffrey observed to be on task ninety percent of the time).

15. On September 1, 2000, the Commissioner published the final, current version of regulations on childhood disability. *See* 65 F.R. 54747. These regulations changed the names of the "areas", now called "domains," to be assessed when determining disability. Thus, the current domain of "acquiring and using information" was formerly the "area" of "cognitive/communicative functioning;" the current domain of "attending and completing tasks" was formerly the area of "concentration, persistence and pace;" and the current domain of "interacting and relating with others" was formerly the area of "social functioning." Therefore, the areas assessed by the ALJ in the 1998 determination are essentially the same as those assessed in the 2002 determination, only under the old nomenclature.

report from David Glass, Jeffrey's treating psychiatric social worker, indicating age-appropriate cognitive skills—an improvement over the one-year delay in cognitive skills indicated by Mr. Glass' report three months earlier—and a March 23, 1996 report from Jeffrey's teacher, Ms. Hunter, indicating that Jeffrey enjoyed reading and was "progressing nicely" in mathematics and reading. (Tr. 18).

As for Jeffrey's communicative functioning, the ALJ's decision noted that Jeffrey's October 12, 1994 speech evaluation showed severe delays in general vocabulary, but found his speech skills to be clear and intelligible and his auditory skills to be within normal limits. The ALJ also took note of the July 5, 1997 report by Mr. Glass that indicated age-appropriate communicative skills, rapid speech and logical thought, and a July 7, 1997 report by Dr. Sang Il Choi, Jeffrey's treating physician, reporting no impairments in speaking or hearing. (Tr. 18).

Next, the ALJ found slight limitations in the area of motor functioning. The decision noted that in 1997 Dr. Choi reported no physical impairments, and that Mr. Glass reported age-appropriate fine and gross motor skills. These findings, the ALJ noted, demonstrated improvement over the March 14, 1994 occupational therapy assessment, which had found good gross motor skills but deficits in visual-motor/perceptual skills. (Tr. 18).

The ALJ found less-than-marked limitations in social functioning. The opinion noted: (1) that Ms. Hunter's March 23, 1996 report attributed the claimant's acting out to attention-getting and unmet emotional needs, (2) that a March 31, 1993 psychological report noted that his mother said that Jeffrey gave her "the hardest time," evidencing that the claimant's acting out is primarily toward his mother, (3) that a February 16, 1994 IEP report showed

that although Jeffrey had been referred to the program for severe behavioral problems, he had not exhibited those problems in learning and counseling environments, (4) that treatment had been inconsistent due to frequent absences, (5) that Jeffrey had shown a positive response to Ritalin, but that medication compliance had been inconsistent, (6) that Mr. Glass noted in his July 5, 1997 report that claimant had made progress in decreasing hyperactivity and destructive behavior at home and school, and (7) that Jeffrey's emotional and behavioral difficulties were complicated by the disappearance of his father and two siblings. (Tr. 19).

The ALJ found no limitations in the area of personal functioning, based on a lack of evidence in the IEP records showing any such limitation. (Tr. 20). To the contrary, the records indicated that the claimant was able to dress and undress himself, was toilet-trained, and washed his hands with soap and water—all evidence of satisfactory personal functioning. (*Id.*).

Finally, the ALJ found less-than-marked limitations in the area of concentration, persistence, and pace. The opinion noted that the claimant is limited by poor impulse control, impaired frustration tolerance, and the inability to delay gratification. (*Id.*). But the ALJ found these factors were outweighed by Mr. Glass' 1997 report, which noted significant improvement in Jeffrey's ability to focus in school, and by the ALJ's own observation that Jeffrey had retained enough concentration, persistence, and pace to stay in school despite his symptoms. (*Id.*).

## VI. *Judicial Review and Remand*

The ALJ's 1998 decision became final on February 1, 1999, when the SSA Appeals Council denied plaintiff's request for review. (Tr. 360). Plaintiff then brought an action in district court pursuant to 42

U.S.C. § 405(g). On June 5, 2001, Judge Marrero remanded Jeffrey's case for further determinations by the SSA Commissioner on the grounds, articulated in Judge Francis' R & R, that: (1) the ALJ had failed to adequately develop the record, (2) the ALJ had overlooked evidence in the record favorable to Jeffrey's claim and (3) the ALJ's findings were unsupported by substantial evidence in the record. (Tr. 380–95, 404). *See* ftn 1, *supra.*

Specifically, in evaluating the ALJ's findings concerning the domain of concentration, persistence, and pace, the R & R noted that, "Even though the ALJ is not required to reconcile all of the inconsistent evidence in the record, the failure to account for, or even acknowledge, relevant evidence is 'plain error.'" (Tr. 384) (citations omitted). On the subject of Jeffrey's social development, the R & R stated

> the ALJ's finding of a less than marked impairment flies in the face of significant evidence in [the] record, and he neither controverts nor addresses ample documentation of Jeffrey's ongoing behavioral problems...It is well established that 'an ALJ may not 'selectively choose' evidence in the record that supports his conclusions.' ... Indeed, the ALJ must address all relevant evidence even if it does not support his conclusion.

(Tr. 387–88) (citations omitted). Finally, the R & R concluded that

> Jeffrey has severe learning disabilities that have hampered both his cognitive and communicative development as defined in the regulations. The ALJ's finding to the contrary is not supported by substantial evidence and suffers from inadequate supporting documentation due to the failure to develop the record.

(Tr. 391).

Judge Marrero declined to award interim benefits as recommended by Judge Francis but ordered that all further proceedings be concluded, and a final decision be issued by the Commissioner, within ninety days of the Judge's June 5, 2001 order. (Tr. 404–05).

## VII. *The ALJ's 2002 Determination of Non–Disability*

Following submission of additional evidence and an August 8, 2001 evidentiary hearing, the ALJ again issued a decision finding Jeffrey non-disabled. He engaged in the same three-step process by which he found that Jeffrey was not engaged in substantial gainful activity and that he did possess a medically determinable combination of impairments—consisting of ADHD, ODD and a speech/language delay—that is severe. (Tr. 314). He then briefly summarized the voluminous record, without passing judgment on any conflicting evidence, before determining that Jeffrey's limitations were not functionally equivalent to one of those impairments listed in the SSA Regulations. (Tr. 314–17)

In making his determination, the ALJ remarked on Jeffrey's functioning in each of the following six "domains," as required by legislation: (a) acquiring and using information, (b) attending and completing tasks, (c) interacting and relating with others, (d) moving about and manipulating objects, (e) caring for yourself, and (f) health and physical well being. He found less-than-marked limitations in the first four and no limitation in the latter two. (Tr. 317–18). The ALJ's comments with respect to the first three domains—the ones in which plaintiff challenges his findings—are as follows.

> In the first domain, "acquiring and using information" ... [t]he claimant possesses less than marked limitations in this domain. His intelligence is low, but he has not been left back from any of his special education classes, and he is now

attending 6th grade. He has been performing weakly in math and reading, but showed much progress over the years. His speech delays are vastly improved...

In the second domain, "attending and completing tasks" ... [t]he claimant has less than marked limitations in this area of functioning. He has been determined to have ADHD, but again he has become significantly less restless and hyper...

In the third domain, "interacting and relating with others" ... [t]he claimant possesses less than marked limitations in this domain. He had fights in the past and poor behavior and school, but with improvement...

(Tr. 317).

In conclusion, the ALJ remarks that he found "the testimony about the claimant's symptoms and limitations reflect an improvement in his conditions and they do not rise to the level of 'disability' within the meaning of the Social Security Act and Regulations." (Tr. 319). The ALJ did not consider whether Jeffrey might have been disabled at any point during the preceding seven and a half years covered by his application.

Plaintiff now seeks review of this determination on the grounds that: (1) the ALJ failed to articulate an adequate explanation for his findings of less-than-marked limitations, (2) he failed to consider whether, despite improvements, Jeffrey might still be markedly limited, (3) he failed to address whether Jeffrey was ever disabled for the statutorily-required, twelve-month period at any time covered by his application, (4) the ALJ underestimated the severity of Jeffrey's limitations and did not consider how he would function outside of highly structured settings and (5) the ALJ failed to consider the combined effects of Jeffrey's multiple, less-than-marked limitations. (Compl.¶ 7).

## DISCUSSION

### I. Standard of Review

The Social Security Act, 42 U.S.C. § 301 et seq., provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing a denial of disability benefits, therefore, a court may not determine disability de novo, see Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000), but may reverse a finding of the Commissioner only if that finding is not supported by substantial evidence in the record. See 42 U.S.C. § 405(g) (made applicable to SSI cases by 42 U.S.C. § 1383(c)(3)). This substantial-evidence test applies not only to the Commissioner's findings of fact, but also to the inferences and conclusions of law to be drawn from those facts. See Carballo ex rel. Cortes v. Apfel, 34 F.Supp.2d 208, 214 (S.D.N.Y. 1999).

Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). See Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir.1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir.1991). When determining "whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quotation and citation omitted). The ALJ need not have reconciled every conflict in the record. See Miles v. Harris, 645 F.2d 122, 124 (2d Cir.1981). However, "crucial factors in any determination must be set forth with sufficient specificity

to enable us to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984). *See e.g., Arnold v. Secretary of Health, Education, and Welfare*, 567 F.2d 258 (4th Cir.1977) (noting that the Secretary must have analyzed all evidence and explained the weight given to probative exhibits in order for the court to find his decision supported by substantial evidence); *Williams v. Heckler*, 1986 WL 1440 at *4 (S.D.N.Y.1986) ("On this record, the Court cannot itself determine which clinical findings, diagnoses and medical opinions were relevant to the ALJ's determination that plaintiff retained the full capacity to do sedentary work. Consequently, I cannot tell if that determination was supported by substantial evidence."). *See also Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999) (stating that claimant is entitled to a clear explanation of the Commissioner's reasoning when, in finding no disability, the Commissioner chooses to discredit the contrary opinions of treating professionals). In other words, the court "may not accept appellate counsel's *post hoc* rationalization for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

█ In the event that the court finds a lack of substantial evidence for the Commissioner's findings, the court has two options. If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court will remand the case for further development of the evidence. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980). If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. *Id. See Gold v. Sec'y of Health, Edu-*

*cation & Welfare*, 463 F.2d 38, 44 (2d Cir.1972).

## II. The ALJ's Findings Are Not Supported by Substantial Evidence

█ The plaintiff challenges the ALJ's 2002 findings that Jeffrey has a less-than-marked limitation in the three domains of: (1) acquiring and using information, (2) interacting and relating with others and (3) attending and completing tasks. (Memorandum of Law in Opposition to Motion for Remand and in Support of Cross–Motion for Judgment ("Opp./Support Memo") at p. 21). We conclude that the ALJ's reasoning does not sufficiently acknowledge and weigh the substantially conflicting evidence contained in the record and that some of his findings are not supported by substantial evidence.

### A. Acquiring and Using Information

Regarding the domain of acquiring and using information, the ALJ states

claimant possesses less than marked limitations...His intelligence is low, but he has not been left back from any of his special education classes, and he is now attending 6th grade. He has been performing weakly in math and reading, but showed much progress over the years. His speech delays are vastly improved.

(Tr. 317). The record does contain evidence of some improvement. *See generally*, ftn 8, *supra*. For instance, a 1997 speech and language evaluation cited by the ALJ showed that Jeffrey had normal articulation, only "minor" problems in sentence formulation, and some delayed expressive and receptive language skills. (Tr. 315). The ALJ also notes a June 2000 teacher's report indicating that Jeffrey's speech had improved and that he had met

eighty percent of his speech and language goals.[16] (*Id.*).

The ALJ, however, does not address the significant quantity of evidence in the record indicating continued impairment in Jeffrey's intellectual and academic functioning. *See generally,* ftn 7, *supra.* First, as the ALJ only obliquely acknowledges, Jeffrey's IQ falls in the borderline category between low-average intellectual functioning and mild mental retardation. (Tr. 1038). Second, Jeffrey's reading abilities are undeniably impaired. His 1997 IEP stated that "Jeffrey's reading skills were extremely below grade level." (Tr. 464). Three years later, in 2000, Jeffrey's fourth grade teacher noted that, at age eleven, he "knows his alphabet[ ] and can most of the time make up the correct sound individually," but that his goals for the next academic year included learning the sounds made by combinations of letters. (Tr. 422). Moreover, in 2000, Jeffrey could not read the questions on his standardized tests but had to have them read aloud and the time limits waived. (Tr. 427).

Third, the record indicates that Jeffrey has significant receptive and expressive language delays. *See generally,* ftns 5 and 6, *supra.* When last tested in 1997, Jeffrey scored below the first percentile in three of four Spanish-language measures. He also scored at or below the first percentile on all·four English measures. (Tr. 1050). A score at or below the first percentile satisfies the SSA's regulatory definition of a marked limitation, since the bottom 2.3 percent of any population is more than two SDs below the mean. *See*

*Duran v. Barnhart,* 2003 WL 103003, *10 (S.D.N.Y.2003). Moreover, in 2000, Jeffrey's teacher documented that he had trouble expressing himself orally, speaking in complete sentences and using age-appropriate language. (Tr. 458).

While each of these three facets of Jeffrey's impaired functioning may not, in isolation, amount to a marked or severe limitation, in combination, they cannot summarily be dismissed as less-than-marked, which is what the ALJ's 2002 decision has done. *See, e.g., Encarnacion,* 191 F.Supp.2d at 474 (two less-than-marked limitations in one domain may cumulatively contribute to the finding of a marked or extreme limitation). Moreover, the ALJ highlights Jeffrey's improvement in his speech and language abilities but fails to consider the possibility that, despite some gains, Jeffrey may still suffer from a marked or severe limitation.[17] Finally, the ALJ in effect rules that Jeffrey's improvement in the mid and late 1990s justifies the conclusion that his limitations are now less-than-marked while ignoring the very striking limitations noted in the record as early as 1993 and 1994, when Jeffrey's application was first filed.

In light of the ALJ's failure to acknowledge or address pertinent, conflicting evidence in the record and his failure adequately to explain the basis for his finding of a less-than-marked limitation in the domain of acquiring and using information cannot stand. Moreover, to the extent that he implicitly finds that Jeffrey did not have marked limitations for any twelve-month period dating from 1994, we find

**16.** The 2000 Student Progress Report to which the ALJ refers states that Jeffrey met three of his short-term goals with eighty percent accuracy. These goals, for an eleven year old, included such tasks as naming the months of the year and providing a word to complete a sentence. (Tr. 448).

**17.** The ALJ's failure to consider this possibility in 1998 constituted one of the grounds on which the district court initially reversed and remanded. (Tr. 385, 404).

that his decision is not supported by substantial evidence.

### B. Interacting and Relating with Others

Likewise, in the domain of interacting and relating with others, the ALJ's conclusion is legally inadequate and not supported by substantial evidence. In finding a less-than-marked limitation, the ALJ noted that the plaintiff "has had fights in the past and poor behavior at school, but with improvement." (Tr. 317). *See, e.g.*, Tr. 295 (July 1997 report by social worker notes that Jeffrey "has shown some overall improvement in response to medication [and] psychotherapy—aggressive behavior has declined and incidence of running away has decreased"). In focusing exclusively on Jeffrey's improvement, however, the ALJ discounts, without explanation, Jeffrey's long-documented history of behavioral problems, including the use of weapons at home and at school, *see generally*, ftns 9 and 10, *supra*, and ignores the possibility that despite improvements, Jeffrey's functioning in this domain may still be impaired. Moreover, the ALJ ignores the fact that Jeffrey's improvements occurred within the context of a small, structured, special education classroom and that various professionals have expressed concern over Jeffrey's ability to function in a non-structured setting. *See* ftn 11, *supra*. *See also* 20 C.F.R. § 416.924a(b)(5)(iv) (determination of child's limitations should be based, in part, on how child behaves when structures are removed).

Also, the domain of interacting and relating with others concerns more than fights and disruptive behavior. The regulatory description of the domain includes the ability to "talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." 20 C.F.R. § 416.926a(i)(2)(iv).[18] The ALJ did not address any of the evidence of Jeffrey's significant limitations in this area. *See generally*, ftns 5 and 6, *supra*.

Finally, even if Jeffrey's behavioral and communicative problems individually constituted a less-than-marked limitation, the combination of the two may amount to a marked limitation. *See Encarnacion*, 191 F.Supp.2d at 474. Thus, in light of the ALJ's failure to acknowledge or address copious, probative evidence supporting a finding of a marked limitation in this domain, we conclude that his determination on this point cannot withstand analysis. Moreover, in view of the record of significant limitations at least as of 1994, his decision is not supported by substantial evidence.

### C. Attending and Completing Tasks

The ALJ's findings in the second domain, attending and completing tasks, are likewise defective and not supported by substantial evidence. In finding less-than-marked limitations in this domain, the ALJ notes that the claimant "has been determined to have ADHD, but again he has become significantly less restless and hyper." (Tr. 317). Some record evidence supports the ALJ's finding. *See generally*, ftn 14, *supra*. For example, a April 1997 report by Jeffrey's psychiatric social work-

18. After the 2000 amendments to the SSA regulations, impairments in expressive language ability are now germane to two domains: acquiring and using information and interacting and relating with others. Accordingly, the SSA now takes the position that a child with speech-language deficits at the marked level will normally be found to have a marked limitation in the domain of interacting and relating with others, even though socially well-behaved. *See* Affidavit of James M. Baker, sworn to Feb. 20, 2003 at Ex. A, May 14, 2001 Childhood Q & A Compendium, issued by the Commissioner at pp. 39–40.

er noted that "[the] patient has made some gains, in terms of decreased hyperactivity and disruptive behavior at home [and] school." (Tr. 285). Also, a school psychologist, observing Jeffrey during thirty minutes of classroom work in 1997, remarked that he was on task ninety percent of the time. (Tr. 536).

The ALJ's 2002 decision, however, makes no attempt to reconcile these positive snippets of evidence with the numerous indications of Jeffrey's continued hyperactivity and inability to concentrate. *See generally*, ftn 13, *supra.* For instance, a July 1997 report by Jeffrey's psychiatric social worker notes that the "[p]atient continues to be hyperactive, disruptive at school [and] home," (Tr. 292) and that "p[atien]t continues to show poor impulse control, poor judgment, impaired frustration tolerance, inability to delay gratification." (Tr. 295). Such findings are consistent with school reports dating from 1993 that document Jeffrey's inability to focus. *See, e.g.*, Tr. 97 ("He also exhibits difficulty in sustaining attention to task, growing increasingly restless and fidgety in the one-to-one learning setting,"); Tr. 613 (1995 teacher's report showing concern for Jeffrey's poor self-control and inability to focus on task); Tr. 586 (1997 teacher's report remarking that Jeffrey needs help developing his work habits and the ability "to focus in and keep still in order to stay on track").

Here, the ALJ's 2002 opinion gives no explanation for why he discounted the significant quantity of evidence indicating Jeffrey's hyperactivity and inability to concentrate. While not every conflict in the record need be reconciled, the ALJ "may not 'selectively choose' evidence in the record that supports his conclusion." *Castillo v. Apfel*, 1999 WL 147748, at *8 (S.D.N.Y. Mar.18, 1999) (citing *Gecevic v. Secretary of Health & Human Services*, 882 F.Supp.

278, 286 (E.D.N.Y.1995)) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983)). In light of the ALJ's exclusive emphasis on evidence favoring a less-than-marked limitation in the domain of attending and completing tasks, without weighing any of the evidence to the contrary, we conclude that the ALJ's decision on this point is legally deficient. Moreover, to the extent that the ALJ implicitly found no marked limitations dating back to 1994, the decision is not supported by substantial evidence.

In sum, we conclude that the ALJ's finding of a less-than-marked limitation in three domains is legally inadequate and not supported by substantial evidence. As such we recommend that the ALJ's 2002 decision be reversed.

### III. *Remand*

■ Plaintiff argues that the court should reverse and award benefits on the grounds that the record contains persuasive proof of disability and that a remand for further evidentiary proceedings would serve no purpose. (*See* Opp./Support Memo at 21). The Government, however, seeks a remand for further evidentiary proceedings, that would allow for submission of additional evidence and further development of the record. (*See* Remand Memo at pp. 6–8). Because the well-developed record contains substantial, and indeed compelling, evidence of Jeffrey's disability and because the Commissioner has twice failed to marshal substantial evidence to support his finding to the contrary, and in light of the nine-year adjudicatory delay in this case, we recommend that Jeffrey's claim be remanded solely for the calculation of benefits.

### A. The Court's Discretion to Remand

As amended in 1980, the Social Security Act affords the district court discretion to remand claims to the Commissioner for

further administrative proceedings when: (1) the Commissioner has shown good cause for remand before the answer is filed, or (2) new, material evidence exists that was not previously incorporated for some good cause shown. *See* 42 U.S.C. § 405(g).[19] However, the Second Circuit, relying on legislative history, has held that even when the circumstantial requirements of section 405(g) are not met, a court may remand where the Commissioner has applied erroneous legal standards or arrived at a determination not supported by substantial evidence. *See Carroll v. Sec'y of Health and Human Services*, 705 F.2d 638, 644 (2d Cir.1983) (noting that the 1980 amendment does not preclude remand when the Secretary has misapplied the law or failed to provide a fair hearing); *Aubeuf v. Schweiker*, 649 F.2d 107, 116 (2d Cir. 1981) (same); H.R.Rep. No.96–100, 96th Cong., 1st Sess. 13 (1979) (stating that the 1980 amendment "is not to be construed as a limitation of judicial remands currently recognized under the law in cases which the Secretary has failed to provide a full and fair hearing, to make explicit findings, or to have correctly apply [sic] the law and regulations").

In Jeffrey's case, the Commissioner arrived at a determination of non-disability that was unsupported by substantial evidence. Thus, assuming that this case does not satisfy 405(g)'s circumstantial requires for remand—and we do not believe that it does [20]—under *Aubeuf* and *Carroll*, this court still has the discretion to remand for further proceedings. Such a remand, however, is not appropriate given the posture of Jeffrey's case.

## B. Remand Solely for Calculation of Benefits

Reversal and remand to the Commissioner for further proceedings is the usual

---

19. Section 404(g) states:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

20. The Government argues that "good cause" for remand exists because a remand would allow the ALJ: (1) to elaborate on his reasoning for finding Jeffrey non-disabled; (2) to address Jeffrey's non-compliance with prescribed medications and frequently missed therapy sessions and (3) to obtain the testimony of a medical expert to assist in the evaluation of the voluminous record. (*See* Remand Memo at pp. 5, 7). The Government, however, provides no explanation for why these tasks were not undertaken in the course of either the 1998 or the 2002 determinations of Jeffrey's disability status. Thus, we do not believe that the Government's request for a third bite at the apple amounts to a show of "good cause," as contemplated by Congress. *See, e.g., Carreau v. Halter*, 2001 WL 586705, at *8 (D.N.H. May 31, 2001) ("We see no reason why the Commissioner should be allowed a third opportunity to satisfy his burden of showing, by substantial evidence, that Carreau is [not disabled] . . . The ALJ had two opportunities to present evidence to rebut or contradict [plaintiff's evidence]"); Joint Report No. 96–944, May 13, 1980, P.L. 96–265 at *59 (citing as an example of "good cause" a situation where procedural difficulties prevent the Secretary from providing the court with a transcript of administrative proceedings). As for the presence of new, material evidence, neither party asserts that evidence now exists that was not available at the time of the ALJ's 2002 determination of Jeffrey's disability status. The government argues that a remand for further administrative proceedings would permit plaintiff to submit further evidence, but does not contend that this evidence is newly available. (*See* Remand Memo at pp. 7–8).

remedy where an administrative record is incomplete or where an ALJ has applied an improper legal standard. *Curry,* 209 F.3d at 124. However, where the claimant has presented substantial evidence of disability and the Commissioner, after full development of the record, has failed to carry his evidentiary burden to show otherwise, the court may remand solely for the calculation of benefits. *See, e.g., id.* (remanding solely for calculation of benefits where, after claimant had proven his disability, Commissioner failed to produce evidence of claimant's capability of gainful employment); *Carroll,* 705 F.2d at 644 (remanding to district court with instructions to remand to Secretary solely for calculation of benefits where ALJ's finding that disability claimant could engage in sedentary work was not supported by substantial evidence); *Parker,* 626 F.2d at 235 (remanding solely for calculation of benefits where record provided persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose). *Accord Allen v. Bowen,* 881 F.2d 37, 44 (3d Cir.1989) (remanding for calculation of benefits on grounds that "[w]here as here the claimant established a *prima facia* case of entitlement, the record was fully developed, and there is no good cause for the Secretary's failure to adduce all the relevant evidence in the prior proceeding, we see no reason to remand for further fact finding"); *Carreau,* 2001 WL 586705, at *8 (remanding for calculation of benefits on the ground that Commissioner had had two opportunities to rebut or contradict plaintiff's evidence of disability but both times had failed to do so). *See also*

*Dousewicz v. Harris,* 646 F.2d 771, 773 (2d Cir.1981) (stating that where the court "finds that the [Commissioner]'s decision is not supported· by substantial evidence, § 405(g) authorizes the court to reverse the ·[Commissioner]'s decision 'with or without remanding the cause for a rehearing.' " (quoting section 405(g), as amended in 1980)).

■ This case law evidences reviewing courts' refusal to recycle deserving claimants through the SSA bureaucracy simply because the ALJ has failed to produce a legally adequate opinion. This rationale applies with equal force to Jeffrey's case, where the well-developed record contains substantial evidence of Jeffrey's disability and the Commissioner failed, first in 1998 and later in 2002, to marshal substantial evidence to the contrary.[21]

Moreover, in the ALJ's 2002 finding of non-disability, the opinion appears to have ignored most of the evidentiary concerns raised by the district court in 2001, shedding less light on the ALJ's reasoning than did the 1998 decision, which was remanded for being insufficiently supported by evidence. For instance, the ALJ's 1998 determination found that Jeffrey suffered from a less-than-marked limitation in the area of "social functioning," based on the fact that: (1) Jeffrey's teacher attributed his acting out to attention-seeking, and felt that his emotional needs were not being met, (2) a March 31, 1993 psychological report noted that Jeffrey's mother had said that he gave her "the hardest time," evidencing that the claimant's acting out was primarily toward his mother, (3) a

---

**21.** Determining, *de novo,* whether Jeffrey is disabled, as defined by the SSA regulations, is beyond the scope of our review. *See Curry,* 209 F.3d at 122. Rather, we simply note that substantial evidence exists in the record to support a finding of disability—*e.g.,* Jeffrey has been diagnosed with ADHD and ODD and

his teachers and treating professionals have noted his continuing, substantial delays in written and oral language development, his difficulties with focusing and staying on task, and his persistent social and behavioral problems.

February 16, 1994 IEP report showed that although he was referred to the program for severe behavioral problems, he had not exhibited these problems in learning and counseling environments, (4) treatment had been inconsistent due to frequent absences, (5) claimant had shown response to Ritalin, but compliance had been inconsistent, (6) Jeffrey's psychiatric social worker noted that Jeffrey had made progress is decreasing hyperactivity and destructive behavior at home and school, and (7) Jeffrey's problems were complicated by the disappearance of his father and two siblings. (Tr. 19).

Despite this list of supporting facts, the court nonetheless found the ALJ's determination to be unsupported by substantial evidence, since the ALJ overlooked the multiple reports of Jeffrey's physical aggression towards his peers and continued speech delays. (Tr. 388). In the 2002 opinion, the ALJ again determined that Jeffrey possessed a less-than-marked limitation in the equivalent domain of "interacting and relating with others." This time, however, the ALJ explained his conclusion with only the brief statement that Jeffrey "has had fights in the past and poor behavior at school, but with improvement." (Tr. 317). The opinion contains an equally cursory and vague discussion of the other two disputed domains—"acquiring and using information" and "attending and completing tasks." Thus, the 2002 opinion gives the reader even less insight into the ALJ's reasoning than did the 1998 decision.

This mockery of the remand process constitutes a waste of judicial and administrative resources, and we see no reason to perpetuate it. This is exactly the kind of bureaucratic vortex from which Congress intended to save deserving claimants when it amended section 405(g). *See* Joint Report No. 96–944 at *59 ("[I]t is the hope of the conferees that remands on the basis of these breakdowns in the administrative process should be kept to a minimum so that persons appealing their decision are not unduly burdened by the resulting delay."). We therefore recommend that the Government's motion for remand for further proceedings be denied and that Jeffrey's claim be remanded solely for the calculation of benefits.

## C. Nine–Year Adjudicatory Delay

The lengthy delay in the resolution of Jeffrey's claim further persuades us that the case is properly disposed by remanding solely for the calculation of benefits. As noted, reducing delay in the adjudication of disability claims was a motivating factor in the passage of the 1980 amendment to section 405(g). *See id.* Moreover, speedy resolution of SSI cases is particularly important since such "means tested federal welfare benefits" are intended "to assure that recipients' income is maintained at a level viewed by Congress as the minimum necessary for subsistence." *Grubb v. Apfel,* 2003 WL 23009266, at *8 (S.D.N.Y. Dec.22, 2003) (quoting *Jacques v. United States R.R. Retirement Bd.,* 736 F.2d 34, 38 n. 2 (2d Cir.1984)).

Accordingly, the Second Circuit has recognized delay as a factor militating against a remand for further proceedings where the record contains substantial evidence of disability. *See, e.g., Curry,* 209 F.3d at 124 (noting that a remand solely for benefits calculation is appropriate because plaintiff's application had been pending more than six years, and a remand could result in "substantial, additional delay"); *Carroll,* 705 F.2d at 644 (stating that a remand for calculation of benefits is particularly appropriate because plaintiff filed his claim four years ago and a remand would further delay payment). *Compare Bush v. Shalala,* 94 F.3d 40, 44–45 (2d

Cir.1996) (reversing district court's retroactive award of benefits because plaintiff had failed to present substantial evidence of disability even though claim had been twice remanded to the Commissioner for inadequate reasoning and had been pending for ten years).

Substantial delay in awarding benefits is particularly detrimental in the case of disabled children who require rehabilitative services during their formative years in order to become independent adults. *See, e.g., Maldonado ex rel Maldonado v. Apfel*, 55 F.Supp.2d 296, 298 (S.D.N.Y.1999) (noting that SSI benefits for children "were intended to flow to them at the time of their need to enable them to overcome their disabilities and enter society"); H.R.Rep. No. 92–231 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5134 (stating that SSI was intended to provide children from low-income households with "special assistance in order to help them become self-supporting members of our society").

Jeffrey was five when his mother first filed his claim, and he is now fourteen. Thus, nine years of his childhood—the time when he was most in need of benefits—have already passed. To further deny him benefits when the record contains substantial evidence of disability would only compound the injury he had already suffered.

Finally, we note that when this court initially reviewed Jeffrey's claim in 2001, Judge Marrero attempted to expedite final resolution by imposing a ninety-day time limit on further administrative proceedings. (Tr. 404). The ALJ's January 25, 2002 opinion, however, post-dated that deadline by over four months, a delay that the Commissioner has not sought to explain or justify. Thus, in light of the nine-year delay in the resolution of Jeffrey's claim, and the inevitability of additional delay in the event of further administrative proceedings, we reiterate our recommendation that his claim be remanded solely for a calculation of benefits.

## CONCLUSION

The well-developed record contains substantial evidence of Jeffrey's disability on account of having a marked limitation in more than one domain of functioning. By the Government's own admission, the Commissioner has twice failed to explain his determination of non-disability, which decision is not supported by substantial evidence. Additionally, the Commissioner has exceeded the time limits imposed by this court for resolving Jeffrey's claim, further contributing to what has now become a nine-year delay. We therefore recommend that this court reverse the Commissioner's 2002 decision and remand for the sole purpose of calculating benefits.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room 414, 40 Centre Street, New York, New York and to the chambers of the undersigned, Room 1670, 500 Peal Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e). Jan. 7, 2004.